Clare T. OSGOOD, et al., Respondents,

v.

**MEDICAL, INCORPORATED, Appellant,**

**General Atomic Company, et al., Respondents.**

No. C5–87–986.

Court of Appeals of Minnesota.

Dec. 1, 1987.

Review Denied Feb. 12, 1988.

Peter J. Krieser, Minneapolis, for respondents.

Robert E. Salmon, Kenneth W. Dodge, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for appellant.

Scott B. Lundquist, Austin & Roth, Minneapolis, for respondents.

Considered and decided by WOZNIAK, P.J., and NORTON and IVERSON *, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

After settling the underlying products liability suit, the components parts manufacturer (General) and the finished product manufacturer (Medical) pursued their claims for indemnification. General prevailed, based on the purchase order form for the component part. Pursuant to General's requirements, Medical had typed a caption on its order form incorporating an indemnification term into the contract. The trial court, in separate proceedings, granted summary judgment for General on (1) Medical's duty to indemnify, and (2) the reasonableness of the settlement. We affirm.

## FACTS

Plaintiff Clare Osgood was injured in July 1979 when a component part (a Pyrolite coated disc) of a mitral heart valve fractured, resulting in emergency open heart surgery. The disc was designed, manufactured, and fabricated by General Atomic Company (a partnership consisting of Gulf Oil Corporation and Scallop Nuclear, Inc.). The disc was purchased by appellant Medical, Inc. (Medical) and incorporated into its mitral heart valve. The valve was implanted in Osgood's heart on October 5, 1972.

Osgood commenced a personal injury action against both Medical and General to recover damages suffered as a result of the allegedly defective heart valve.

*The sales transaction involving the disc.*

Medical was formed by Marshall Kriesel in July 1971, for the express purpose of manufacturing heart valves. Kriesel had

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

just purchased the license to manufacture this particular type of heart valve. Prior to formation of the company, Kriesel talked with Dr. John Bokros, head of General's medical products department, about supplying Medical with Pyrolite coated discs. They discussed a number of terms (including price and quantity), but never came to an agreement whereby General would sell the discs exclusively to Medical.

Medical ordered discs from General on Medical's order form. The form contained the following indemnification clause on the back:

14. INDEMNITY—Seller shall indemnify and hold Buyer harmless against any liability, loss, damages or expense resulting from personal injury, death, or property damage arising from or in connection with Seller's performance of this Order.

Initially, General normally acknowledged receiving the orders without any change in terms.

By March 1972, Medical was well into manufacture of their valves. By cover letter dated March 8, 1972, General sent its Special Terms of February 24, 1972 ("Special Terms") to Medical.

The Special Terms provided that Medical was to hold General harmless for any damages resulting from the use of the discs. In capital letters, the terms also specifically disclaimed any warranties of fitness for their intended purpose or of merchantability.

Medical and General thereafter had many discussions over the applicability of the new terms to disc sales; at General's insistence, however, Medical began typing the following language onto the face of its order forms:

Special Terms and Conditions dated February 24, 1972, Applicable to Sales of Gulf Energy and Environmental Systems Pyrolite Carbon Coated Heart Valve Parts for Clinical Use.

The order form for the particular disc involved in this case was Medical's usual printed form, but contained the above caption (relating to the Special Terms) typed on its face.

*The personal injury trial.*

The personal injury jury trial began in June 1982. After five days of trial, General negotiated a *Pierringer* settlement agreement with Osgood, settling their portion of the liability for $150,000. Medical then decided to settle for $60,000, and both settlements were drawn up under one agreement. The settlement document left open the cross-claims between Medical and General for later resolution, and both parties expressly denied any liability to plaintiff.

Medical now contends they were forced to settle because of their inability to defend the case on the merits after General concluded a settlement with plaintiffs. By way of their attorney's affidavit, Medical asserts it had to settle because the expert witnesses involved in their defense of the action were under the "actual or constructive control of [General]." Medical also asserts that the liability experts necessary to defend the action were out of Minnesota, and hence not subject to subpoena. They also assert that the pretrial depositions of all liability witnesses were taken "exclusively by plaintiff's counsel, hence could not be used to effectively present Medical's case to the jury[.]"

*Trial on indemnity cross-claims.*

■ A large portion of the two-day bench trial was devoted to testimony regarding the suitability of the Pyrolite disc for inclusion into Medical's valve. Medical acknowledges the testimony was an attempt to fulfill the requirements for a showing that the contract terms were unenforceable as a contract of adhesion under the analysis outlined in *Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920 (Minn.1982).[1]

---

1. *Schlobohm* defines an adhesion contract as one "drafted unilaterally by a business * * * and forced upon [the] public for services that cannot readily be obtained elsewhere." *Id.* at 924. The two factors for determining whether a contract is one of adhesion are: (1) was the contract the result of the superior bargaining power of one of the parties? and (2) was the service involved a public necessity? *Id.* at 923.

The trial court ruled that General had a right to indemnification from Medical. The court made the following specific fact findings:

5. That the particular Pyrolite-coated disc involved, a component of the heart valve, was purchased from General by Medical using an order form which contained the following language typewritten on its face:

Special Terms and Conditions dated February 24, 1972, Applicable to Sales of Gulf Energy and Environmental Systems Pyrolite Carbon Coated Valve Parts for Clinical Use * * *.

6. That Medical itself typed the language on the order form; that said language was conspicuous and incorporated by reference the text of General's February 24, 1972 special terms and conditions.

7. That Medical's actions constituted acceptance of General's terms and conditions and operated to negate Medical's terms and conditions printed on the reverse side of the form.

8. That the text of the February 24, 1972 terms and conditions contains, *inter alia,* the following specific and conspicuous language:

GULF MAKES NO WARRANTY OF FITNESS FOR THE PURPOSE INTENDED AND NO WARRANTY OF MERCHANTABILITY.

\* \* \* \* \* \*

10. That Medical knew of the indemnity and hold harmless language in the February 24, 1972 terms and conditions when it typed the caption on the order form, and was not a victim of surprise or oppression.

11. That the text of the February 24, 1972 terms and conditions does not specifically mention "negligence" but does contain language which necessarily includes claims alleging negligence on the part of General.

12. That the essential purpose of the agreement is an allocation of risks between merchants, which it has done.

The court concluded that Medical must indemnify General for any claims arising out of the use of the disc in question.

The trial court made it clear that it did not apply the *Schlobohm* analysis. It noted the adhesion contract analysis only applied where a defendant attempts to insulate himself from liability and not, as the case was here, where two defendant manufacturers have settled with a plaintiff and are asserting cross-claims for indemnification.

The trial court also found that the *Schlobohm* test did not apply because this was a sale of goods, to be governed by the Uniform Commercial Code. It noted that this was not a contract for "services," also required under the *Schlobohm* analysis, and that there was no disparity in bargaining power between the two parties.

*Hearing on reasonableness of settlement.*

General filed a motion for summary judgment regarding the reasonableness of the settlement agreement. The trial court granted General's motion for summary judgment in the amount of $150,000. The trial court memorandum accompanying its order states:

Here the fact and the amount of liability were determined by the settlement agreement. Medical could have refused to join in the settlement and proceeded to trial. However, rather than seeking a jury determination as to the amount of damages, Medical chose to participate in the collective settlement agreement. This participation, as well as Medical's failure to object in any way to the settlement amount paid by [General], establish the reasonableness of the damages.

## ISSUES

1. Was the trial court's determination of the terms of this sales contract erroneous?

2. Under the Uniform Commercial Code, were the indemnity and warranty exclusion provisions of the contract unenforceable as unconscionable, as inconspicuous, or for failing of their essential purpose?

3. Were the indemnity provisions ambiguous?

4. Did the reasonableness of the parties' settlement present a question of fact precluding summary judgment?

## ANALYSIS

■ 1. The construction and effect of a contract are questions of law. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). Where the critical evidence is documentary, there is no necessity for the reviewing court to defer to the trial court's judgment of the meaning and credibility of the evidence. *In Re Trust Known as Great Northern Iron Ore Prop.*, 308 Minn. 221, 243, 243 N.W.2d 302, 305 (1976), *cert. den.*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

Medical argues that, under the objective theory of contract, the exculpatory provision contained in General's Special Terms was not part of the contract. Medical cites no case law supporting such a reading of the conflicting terms it placed in its own order form.

■ Where a term is later added to a printed contract and the term conflicts with the printed form, the later term controls. *Danelski v. King*, 314 N.W.2d 818, 820 (Minn.1981). The language which incorporated the Special Terms was typed on the face of the form. It was, of course, added after the printed indemnification term. As the Special Terms directly conflict with the indemnification clause on the back of the form, the Special Terms control.

2. Both parties agree that the Uniform Commercial Code (UCC) applies to this sale of goods between two merchant manufacturers. Medical claims that the indemnification, limitation of warranty, and hold harmless provisions of General's Special Terms of February 24, 1972 are unenforceable under a number of UCC provisions.

**a. Unconscionability.**

■ Whether a contract provision is unconscionable is a question of law for the court. Minn.Stat. § 336.2–302, Minnesota Code Comment. Questions of law are reviewable in this court on a *de novo* basis. *Jadwin v. Minneapolis Star and Tribune Co.*, 367 N.W.2d 476, 483 (Minn.1985).

The code provision regarding unconscionability states, in part:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Minn.Stat. § 336.2–302(1) (1986). The comment to that provision provides additional insight into its purpose:

> [W]hether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. * * * *The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of allocation of risks because of superior bargaining power.*

(Emphasis added.)

■ Medical argues that the doctrine against adhesion contracts, as enunciated in *Schlobohm*, is incorporated into the UCC pursuant to the code's unconscionability provisions. It cites no precedent supporting this theory.

The language in the comment to section 336.2–302(1) clearly indicates this attempted bootstrapping of *Schlobohm* onto UCC unconscionability analysis fails. The UCC comment expressly notes that the principle of unconscionability is "not of disturbance of allocation of risks because of superior bargaining power." Through application of *Schlobohm*, that is exactly the action Medical asks of this court.

Medical does not argue that the conduct involved meets the unconscionability threshold other than through application of *Schlobohm*.

**b. Conspicuousness.**

■ Minn.Stat. § 336.2–316 requires that warranty exclusions must be conspicuous in order to be enforceable. Comment 1 to

that section indicates that implied warranties may be excluded:

only by conspicuous language *or other circumstances which protect the buyer from surprise.*

(Emphasis added.)

The clear purpose of UCC's warranty exclusion limitations is to prevent the buyer from surprise. Medical cannot argue surprise when it typed the caption on its own form.

**c. Failure of essential purpose.**

Minn.Stat. § 336.2–719(2) provides:

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

The trial court found that the essential purpose of these provisions was the allocation of risk between two commercial entities. We agree.

The trial court made this determination after listening to witnesses discuss the purpose of the provisions. It also is clear from the record that there was an ongoing debate between the parties over who would be responsible to individuals who might be injured by the heart valve, and over whose indemnification agreement would apply.

This case involves the allocation of risks between two merchant manufacturers. That is exactly the intended effect of the Special Terms. We will not apply the UCC warranty exclusion provisions to overturn that result when the case involves the allocation of risk between two merchant manufacturers.

**d. Warranty exclusions communicated at time of sale.**

Medical claims that exclusions of implied warranties must be communicated to the seller at the time of the sale to be enforceable. *BarclaysAmerican/Business Credit, Inc. v. Cargill, Inc.,* 380 N.W.2d 590, 591 (Minn.Ct.App.1986) (citing *Dougall v. Brown Bay Boat Works and Sales, Inc.,* 287 Minn. 290, 298, 178 N.W.2d 217, 222–23 (1970)). They argue that the Special Terms were not communicated to them at the time of the sale.

Medical typed the caption relating to the Special Terms on the order form. It is obvious they knew of the exclusions.

3. The question of whether a contract is ambiguous is a question of law, so again is reviewable by this court on a *de novo* basis. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982).

■ Indemnity clauses are to be strictly construed when the indemnitee seeks to be indemnified for its own negligence. *Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.,* 281 N.W.2d 838, 842 (Minn.1979). The contract of indemnity need not specifically mention negligence; however, where the language is so broad that it necessarily applies to negligence, the court will enforce the indemnification agreement. *Johnson v. McGough Construction Co., Inc.,* 294 N.W.2d 286, 288 (Minn.1980).

The Special Terms' indemnity/hold harmless provisions state:

(c) The customer shall assume full responsibility with respect to the use of any component or information furnished by Gulf hereunder, and it is mutually agreed that Gulf assumes no liabilities of any kind with respect to the use by the customer or by any third party of such components or information.

(d) If the customer undertakes to supply Pyrolite carbon coated components to others, it does so in its own discretion and upon its own judgment as to risk and agrees to hold Gulf harmless from any claims for damages and costs related thereto which might arise from use of any component to be supplied under this agreement.

Medical argues that the language of the hold harmless agreement is ambiguous for two reasons.

■ First, it states that General purports to require indemnification from the "use" of the disc as a heart valve component. It states that this language does not purport to indemnify General for claims of alleged inadequate design, manufacture, and inspection of the disc. Medical also argues that the agreement does not specifi-

cally mention negligence. As in *Johnson*, however, the broad language utilized by General necessarily includes indemnification for the claims presented in this case.

■ Second, it argues the agreement is ambiguous because it purports to indemnify "Gulf" without reference to its successors or assigns. In this case, General was a subdivision of Gulf. We conclude that the indemnification of Gulf covers the subdivision where Medical knew at all times that it was dealing with a subdivision of Gulf.

4. The test for whether a settlement is reasonable and prudent, thereby entitling a party to indemnification, is:

> [W]hat a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim.

*Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn.1982).

■ The burden of proof regarding who will have to show the reasonableness of the settlement depends on the circumstances under which the settlement was entered:

> It may be instructive to point out how this case [*Miller v. Shugart*] differs from *Butler Brothers v. American Fidelity Co.* [citation omitted]. In *Butler* we held that a stipulated judgment, while not conclusive on the insurer, was presumptively so, and that the burden was on the insurer to show the settlement was unreasonable. In *Butler*, however, the insured entered into a settlement with the plaintiff in the course of a "real trial" while defending itself * * *. Thus, the *Butler* settlement had quite different *bona fides* than the settlement made here.

*Id.* at 735. The court concluded that the difference in circumstances (in *Miller*, the settlement was entered into *prior to* trial) called for two different burdens of proof. Where the settlement was entered into before trial (*Miller*), the party seeking indemnification must show the settlement was reasonable and prudent. When the case is settled during a "real trial" (*Butler*), the proposed indemnitor must bear the burden of showing that the settlement was unreasonable.

Medical also argues it is entitled to a trial on the issue of reasonableness. As *Miller* stated:

> The question is whether the record shows, as a matter of law, that the [settlement] * * * was reasonable and prudent.

*Id.* at 736. *Accord, Lemmer v. IDS Properties, Inc.*, 304 N.W.2d 864, 867 (Minn. 1981) (trial court accepted amount settled for as reasonable and proper). *Lemmer* noted that a settlement was reasonable when:

> [The defendants] settled their potential exposure to liability at a time when it was clear that the jury *could have* found them liable and damages *could have* been well in excess of the amount of settlement.

*Id.* at 869 (emphasis added).

The process for determining the reasonableness of a settlement is, in summary, as follows:

First, in a case where the settlement was entered into during trial, the burden of proof is on the party seeking to avoid indemnification to show that the settlement was unreasonable. *Miller*, 316 N.W.2d at 735.

■ Second, the determination of the question of reasonableness is a question of law for the court. *Id.* at 736. The court will take into account the *bona fides* of the settlement in making this determination, including the circumstances of the case and settlement.

■ Third, the question is not whether the party seeking indemnification *would have* been liable for at least the amount of the settlement; the question is whether the party *could have* been liable under the facts shown at trial.

■ In this case, Medical bore the burden of showing to the court that the settlement was unreasonable. The trial court, in looking at the *bona fides* of the settlement, determined from the record before it that the settlement was reasonable and prudent.

During trial, General settled. Medical then settled without making any complaint about the reasonableness of the settlement. Medical could have proceeded to trial on its own. We agree these facts and circumstances clearly indicate that a jury "could have" found both liability and damages in excess of the amount paid in settlement. There is no indication that the parties were not settling on a good faith basis. Medical has not met its burden to show the settlement was unreasonable.

■■■ Medical's assertion that they were unprepared to continue the trial after General settled has no bearing on this issue. Medical never brought this complaint to the attention of the trial court at the time the settlement was entered. General did not, at any time, agree to provide Medical with the expert testimony that Medical feels was necessary for its own defense.

### DECISION

The trial court correctly concluded that the Special Terms were incorporated by reference and negated Medical's indemnification clause. The Special Terms were enforceable under the UCC, and were not ambiguous. The parties' settlement was reasonable.

Affirmed.