# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 13-1316

———————————————————

The Netherlands Insurance Company, a New Hampshire corporation

*Plaintiff - Appellant*

v.

Main Street Ingredients, LLC, a Wisconsin limited liability company

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: November 19, 2013
Filed: March 18, 2014

——————————

Before RILEY, Chief Judge, MELLOY and KELLY, Circuit Judges.

——————————

RILEY, Chief Judge.

Malt-O-Meal Company (Malt-O-Meal) sued Main Street Ingredients, LLC (Main Street) in Minnesota state court, which suit involved the June 2009 voluntary recall of dried milk Main Street bought from Plainview Milk Products Cooperative (Plainview) and sold to Malt-O-Meal. The Netherlands Insurance Company (Netherlands) sued its insured, Main Street, in federal court, seeking a declaratory judgment as to whether Netherlands had a duty to defend or indemnify Main Street

in the underlying lawsuit with Malt-O-Meal. The district court[1] granted partial summary judgment in favor of Main Street and denied summary judgment for Netherlands, declaring that under the relevant policy, Main Street had established a prima facie case of coverage to which no exclusion applied. Netherlands appeals. Having appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND
### A.    Facts

In 2007, Plainview sold dried milk to Main Street, which, in turn, sold Plainview's dried milk to Malt-O-Meal. Malt-O-Meal incorporated the dried milk into its instant oatmeal products.

Also in 2007, Main Street purchased a commercial liability insurance policy from Netherlands, and in 2008, Main Street purchased an extension of the policy (collectively, the policy).

In June 2009, the United States Food and Drug Administration (FDA) found Salmonella bacteria on food-contact surfaces and in areas used to manufacture dried milk products in Plainview's plant. The FDA also observed thirteen instances of insanitary conditions in the plant. See 21 U.S.C. § 342(a)(4) (deeming food "prepared, packed, or held under insanitary conditions" to be "adulterated"). On June 23, 2009, Plainview issued a product recall notice (notice) announcing a "voluntary recall" of dried milk produced by Plainview in 2007, 2008, and 2009, and stating its dried milk had "the potential to be contaminated with Salmonella." Plainview's notice stated, in part:

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Because of the seriousness of this situation, this recall extends to the user level. This means that ALL levels of distribution down to the end user need to be notified. We recommend including a copy of this recall letter to all downstream consignees who may have received these recalled products.

If you or your customers have repacked any of the recalled products, the FDA then considers the repacked products to be a "NEW" product for which the re-packer will be responsible to recall. Anyone who has repacked our products should contact their local FDA district office to discuss the need to initiate a recall of the repacked product.

If you or your customers have used our products as an ingredient of another food . . . , FDA considers this a "NEW" products [sic] for which the manufacturer will be responsible to recall. Anyone who has used our products as an ingredient should contact their local FDA district office to discuss the need to recall.

Main Street forwarded the notice to Malt-O-Meal, stating the dried milk had "the potential to be contaminated with Salmonella." As a result, Malt-O-Meal recalled its instant oatmeal that contained the recalled dried milk.

On August 18, 2009, the FDA sent a letter to Plainview responding to Plainview's submission of a reconditioning plan to address the FDA's findings at Plainview's facility. The FDA stated,

Your firm is responsible for developing a reconditioning plan that corrects and removes the conditions that *caused the recalled, nonfat dry milk to be adulterated*. These conditions pertain not only to the product itself, but also to the environment found within the facility in which the product was prepared, packed or held, and *the practices that may have led to the adulteration.*

(Emphasis added).

**B. Procedural History**

In October 2009, Malt-O-Meal sued Main Street and Plainview in Minnesota state court (underlying action). As to Main Street, Malt-O-Meal asserted claims of strict products liability, breach of express warranties, breach of implied warranties of merchantability and fitness for a particular purpose, and breach of contract, all based upon the loss of the instant oatmeal containing the dried milk. In July 2010, pursuant to the policy, Netherlands hired counsel to defend Main Street in the underlying action, but did "so under a reservation of rights since coverage may not apply to some or all of the allegations against [Main Street]."

In March 2011, Netherlands sued Main Street and Malt-O-Meal[2] in federal court seeking a declaration it had no duty to defend or indemnify Main Street as to the claims in the underlying action.

In May 2012, in the underlying action, the Minnesota state court granted Main Street's motion for summary judgment on the strict liability claim, but denied the motion on the remainder of the claims. A month later, Malt-O-Meal and Main Street settled the remaining claims for $1,400,000.

In this federal case, the district court granted Main Street's motion for partial summary judgment and denied Netherlands' motion for summary judgment. The parties stipulated to entry of final judgment, and the district court awarded $1,400,000, plus interest, to Main Street. Netherlands timely appealed.

**II. DISCUSSION**

**A. Standard of Review**

"On appeal, we review a district court's decision on cross-motions for summary judgment *de novo*." Harleysville Ins. Co. v. Physical Distribution Servs., Inc., 716

---

[2]The district court dismissed Malt-O-Meal with prejudice in August 2012.

F.3d 451, 457 (8th Cir. 2013) (quoting Dunn v. Aamodt, 695 F.3d 797, 799 (8th Cir. 2012) (internal marks omitted)). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We . . . review a district court's interpretation of the contractual provisions of an insurance policy de novo as a question of law." Noran Neurological Clinic, P.A. v. Travelers Indem. Co., 229 F.3d 707, 709 (8th Cir. 2000).

## B.    Choice of Law

Despite initial questions whether Wisconsin or Minnesota law should apply, the district court found "no conflict between Minnesota and Wisconsin law on any determinative issue" and applied Minnesota law.[3] Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies, and we apply substantive Minnesota law to this diversity action, consulting Wisconsin law as persuasive authority when appropriate. See Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010) ("Minnesota law applies, as Minnesota is the forum state and neither party has raised a choice-of-law claim."). "We must predict how the Supreme Court of Minnesota would rule, and we follow decisions of the intermediate state court when they are the best evidence of Minnesota law." Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012).

## C.    Potential vs. Actual Liability

An initial difficulty with this case lies in the fact the underlying action was not concluded with a finding of liability or non-liability. Main Street and Malt-O-Meal settled after the state court denied Main Street summary judgment on most of Malt-O-

---

[3]Both parties told the district court they, too, found no conflict between Minnesota and Wisconsin law.

Meal's claims.[4] But under Minnesota law, "[l]iability need not be in the form of a verdict—a [reasonable and prudent] settlement can trigger the duty to indemnify." Jackson Nat'l Life Ins. Co. v. Workman Sec. Corp., 803 F. Supp. 2d 1006, 1012 (D. Minn. 2011) (citing Miller v. Shugart, 316 N.W.2d 729, 735 (Minn. 1982) (en banc)). Where the underlying action settles before trial, "[t]he party seeking indemnification need only show it **could have** been liable under the facts shown at trial not whether they **would have** been." Id. (citing Osgood v. Med., Inc., 415 N.W.2d 896, 903 (Minn. Ct. App. 1987)). The district court properly stated that in order for Main Street to prevail, a finding of *potential liability* in the underlying action is enough, rather than a finding of *actual liability*.

At the same time, the district court added the proviso that the settlement terms must include claims of the insured that enjoyed *actual coverage* in the insurer's policy; *potential coverage* would not be enough, because the insurer only contracted to defend and indemnify claims that are actually covered. "[T]he settlement in the underlying action [must] include[] claims for risks [the insurer] agreed to assume." St. Paul Fire & Marine Ins. Co. v. Nat'l Chiropractic Mut. Ins. Co., 496 N.W.2d 411, 415 (Minn. Ct. App. 1993); accord Gulf Ins. Co. v. Skyline Displays, Inc., 361 F. Supp. 2d 986, 990 (D. Minn. 2005) ("In the circumstances of this case, the court asks whether the settlement included claims for risks [the insurer] agreed to assume."). "In other words, an insurer's duty to indemnify arises only if the insured ultimately proves up facts showing coverage." Nelson v. Am. Home Assur. Co., 824 F. Supp. 2d 909, 915 (D. Minn. 2011), aff'd, 702 F.3d 1038 (8th Cir. 2012).

---

[4]"If indemnity is based on a settlement, then indemnity can be more difficult to analyze." 22 Britton D. Weimer, et al., Minn. Prac., Insurance Law & Practice § 3:2 (2013).

**D. Analysis of the Policy**

Substantively, Netherlands argues it has no duty to indemnify Main Street because (1) the dried milk did not suffer "property damage," and (2) the sale of the dried milk to Malt-O-Meal was not an "occurrence," as defined by the policy. In the alternative, Netherlands argues three policy exclusions apply, relieving Netherlands of any duty to indemnify Main Street.

"It is well-established that general contract principles govern the construction of insurance policies, and that insurance policies are to be interpreted to give effect to the intent of the parties." Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 879 (Minn. 2002) (en banc). "[T]he burden of proof rests upon the party claiming coverage under an insurance policy," so "the insured must establish a prima facie case of coverage." Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co., 825 N.W.2d 695, 705 (Minn. 2013) (quotations omitted). "Insurance contract exclusions are construed strictly against the insurer." Thommes, 641 N.W.2d at 880.

**1. Property Damage**

The policy states Netherlands "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The "insurance applies to . . . 'property damage' only if . . . 'property damage' is caused by an 'occurrence.'" "Property damage" under the policy means:

  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Meanwhile, § 402 of the Federal Food, Drug, and Cosmetic Act states a food product "shall be deemed to be adulterated"

(1)    If it bears or contains any poisonous or deleterious substance which may render it injurious to health; [or]

. . . .

(4)    if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.

21 U.S.C. § 342(a). The parties agree there has been no factual finding that either the dried milk or the instant oatmeal contained Salmonella. Nevertheless, the district court found "property damage is present" in this case because the instant "oatmeal is physically affected, as it includes instant milk that was manufactured in insanitary conditions." In addition, the district court found "property damage" under Minnesota law because Malt-O-Meal's dried oatmeal was legally unsaleable, citing General Mills, Inc. v. Gold Medal Insurance Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001).

In that case, General Mills voluntarily withheld "16 million bushels of raw oats and the equivalent of 55 million boxes of Cheerios" after an FDA inspection revealed the presence of Dursban, an unapproved pesticide, in oat stocks at one of General Mills' plants. Id. at 150. "Dursban presented no health hazard to the consuming public. However, General Mills voluntarily held the adulterated cereals, based on the understanding that the FDA would order it to do so if General Mills attempted to distribute the product." Id. On appeal, General Mills' insurer argued "the district court erred in finding a direct physical loss, because Dursban did not render the oats and products unfit for human consumption; the loss occurred only because of government regulation, and not because of direct damage to the insured property." Id. at 152. The Minnesota Court of Appeals disagreed, stating,

-8-

We have previously held that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way. . . . [T]he function of the food products produced by General Mills is not only to be sold, but to be sold with an assurance that they meet certain regulatory standards. When General Mills is unable to lawfully distribute its products because of FDA regulations, that function is seriously impaired.

. . . .

General Mills was unable to sell its products or use the contaminated oats, because of legal regulations. The business of manufacturing food products requires conforming to the appropriate FDA regulations. Whether or not the oats could be safely consumed, they legally could not be used in General Mills' business. The district court did not err in finding this to be an impairment of function and value sufficient to support a finding of physical damage.

Id. The General Mills decision is a good indicator of applicable Minnesota law, absent direct Minnesota Supreme Court precedent.

Netherlands states the district court erred by making a factual finding that Main Street's dried milk "was manufactured in insanitary conditions" when the Minnesota state court declined to make such a finding. The state court found only that Malt-O-Meal "has presented circumstantial evidence that creates a genuine issue of fact regarding whether the product at issue was contaminated and/or adulterated." But Netherlands ignores the fact that, as discussed above, Minnesota law does not require a factual finding of liability in the underlying action (in this case, in the state court): "Liability need not be in the form of a verdict—a settlement can trigger the duty to indemnify." Jackson Nat'l Life, 803 F. Supp. 2d at 1012 (citing Miller, 316 N.W.2d at 735).

Netherlands also asserts, "[T]he nonfat instant dried milk distributed by [Main Street] was withdrawn from the market because of a potential, but not actual, failure of the product."[5] But the evidence of "actual failure" before the district court included the following: First, the FDA found thirteen instances of insanitary conditions, including Salmonella, in Plainview's plant in 2009. Second, the Plainview general manager, Dallas Moe, testified (as Main Street characterized it, "against his own interests and the interests of Plainview") that some of the insanitary conditions existed in 2007:

> Q.     Observation 3, "Failure to clean food contact surfaces as frequently as necessary to protect against contamination of food." The observation of FDA is specifically on June 29, 2009 in the Agglomerator Number 2 room, the cooling coils on the fluid bed cooling unit had extensive build-

---

[5]Netherlands emphasizes the fact that the recall of the dried milk was "voluntary" and quotes Main Street's expert as saying the "FDA did not have legal authority to require a recall." But the expert also explained,

> Technically, all recalls were voluntary up until the passage and implementation of the Food Safety Modernization Act of 2011. However, FDA did encourage and support the Malt-O-Meal Salmonella recall. The agency also had the regulatory authority to seize the product from commerce and to impose civil fines and order criminal prosecution if Malt-O-Meal had failed to initiate a Class I recall.

> Malt-O-Meal acted appropriately by recalling the product lots suspected of Salmonella contamination.

See also 21 C.F.R. § 7.40(a) ("Recall is an effective method of removing or correcting consumer products that are in violation of laws administered by the Food and Drug Administration. Recall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury . . . . [R]ecall is an alternative to a Food and Drug Administration-initiated court action for removing or correcting violative, distributed products.").

up of extraneous material. Filtered air . . . passes through these cooling coils after which the air directly contacts product in the fluid bed. No additional air filters are used after the cooling coils. . . . Did I read that correctly?

A.  Yes.

Q.  And is it your understanding that's an accurate observation of what was going on in the plant on June 29, 2002 [sic]?

A.  Yes.

Q.  Would that have been the case in 2007 as well?

A.  Yes.

. . . .

Q.  Employees walk from the offices to the dry blend room and Agglomerator Number 1 and Number 2 rooms through the warehouse. There are no foot foamers in the dry blend area, Agglomerator Number 1 and 2 rooms, or the warehouse. Is that also accurate?

A.  Yes.

Q.  Or was accurate in 2009?

A.  Yes.

Q.  Do you think it would have been accurate in 2007?

A.  Yes.

Q.  On June 9, 2009, an employee did not walk through the foot foamer as he entered the plant from the outside. Do you know if that was true?

A.  That's what was stated. Yes. . . .

-11-

Q. [D]o you know if that . . . actually happened?

A. Yes.

Q. It did happen?

A. Yup.

Q. Do you think that that could have happened in 2007 as well?

A. Yes.

Third, the FDA did not concern itself with only the instant milk Plainview produced in 2009, or merely back to 2008. The FDA extended its reach back to 2007, explicitly stating all the recalled dried milk (including the milk manufactured in 2007) was adulterated: "Your firm [Plainview] is responsible for developing a reconditioning plan that corrects and removes the conditions that caused the recalled, nonfat dry milk to be adulterated." Given Moe's unrefuted testimony of insanitary conditions in the Plainview plant in 2007, plus the extent of the reach of the FDA voluntary recall of the dried milk, the district court logically concluded the incorporated instant oatmeal was "*physically* affected, as it includes instant milk that was manufactured in insanitary conditions." (Emphasis added). In other words, because the dried milk was "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," and was therefore "adulterated," 21 U.S.C. § 342(a)(4), whether or not it contained Salmonella, so too was the instant oatmeal. In addition, under Minnesota law, after the FDA findings of insanitary conditions and Plainview's voluntary recall, "[w]hether or not [Malt-O-Meal's instant oatmeal] could be *safely* consumed," the instant oatmeal could not be sold "lawfully," "with an assurance that [it] meet[s] certain regulatory standards." Gen. Mills, 622 N.W.2d at 152. According to Minnesota law, this constitutes physical "property damage" to the instant oatmeal

("[p]hysical injury to tangible property"), and Main Street has "show[n] it **could have** been liable under the facts shown." Jackson Nat'l Life, 803 F. Supp. 2d at 1012.

### 2. Occurrence

An "occurrence" under the policy is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Minnesota Supreme Court has "interpreted the term 'accident' in a similar context to mean 'an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.'" Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co., 819 N.W.2d 602, 611 (Minn. 2012) (quoting Hauenstein v. St. Paul-Mercury Indem. Co., 65 N.W.2d 122, 126 (Minn. 1954)). "[W]hether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative." Am. Family Ins. Co. v. Walser, 628 N.W.2d 605, 612 (Minn. 2001) (en banc). Finding no evidence Main Street intended to injure Malt-O-Meal, the district court found "the recall of the instant milk was an occurrence."

Main Street alternatively disagrees with the district court. Main Street states the "occurrence" was the sale in 2007 of dried milk by Main Street to Malt-O-Meal and the incorporation of the dried milk by Malt-O-Meal into the instant oatmeal, and Main Street did not intentionally sell a product knowing it would be recalled sometime in the future. Netherlands agrees the sale alone, not the recall, would be the only event that could possibly constitute an occurrence. Yet changing the factual "occurrence" does not change the end result of the district court's analysis Cf., e.g., Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 670-71 (8th Cir. 2013) ("This court can affirm on any basis supported in the record.").

Netherlands maintains, "Where the insured's liability exposure results from its failure to provide a product that complies with its contract or guarantees, there is no 'accident.'" But Minnesota case law clearly establishes an "occurrence" can occur in a breach of contract context. See, e.g., Ohio Cas. Ins. Co. v. Terrace Enters., Inc., 260

-13-

N.W.2d 450, 453 (Minn. 1977) (en banc) (determining the settling of an apartment building from faulty construction was an occurrence when the action by the insured might have been negligent, but was "not reckless or intentional").  But see Johnson v. AID Ins. Co. of Des Moines, Iowa, 287 N.W.2d 663, 664, 665 (Minn. 1980) (en banc) (quotation omitted) (noting a "willful and knowing" breach of contract—as a result of "obvious violations of contract standards of workmanship"—was not an occurrence); accord Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 76 (Wis. 2004) ("[A] loss actionable only in contract can . . . be the result of an 'occurrence.'").  Because Main Street did not intentionally sell to Malt-O-Meal FDA-condemnable dried milk, the sale of FDA-condemnable dried milk was an "accident" that constituted an "occurrence" under the policy.

### 3. Your Product Exclusion

The policy excludes from coverage "'[p]roperty damage' to 'your product' arising out of it or any part of it."  "Your product" means, among other things, "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by . . . [y]ou."  In addition, "your product" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'"  "The purpose of the exclusion . . . is to prevent the insured from using its products liability coverage as a form of property insurance to cover the cost of repairing or replacing its own defective products or work."  Holsum Foods Div. of Harvest States Coop. v. Home Ins. Co., 469 N.W.2d 918, 920 (Wis. Ct. App. 1991); accord Maple Island, Inc. v. St. Paul Mercury Ins. Co., C8-96-2352, 1997 WL 406647, at *2 (Minn. Ct. App. July 22, 1997) (unpublished opinion) ("This type of exclusion is intended to exclude coverage for damage to the insured's product itself, as opposed to damage to other persons or property that is caused by the insured's product.").

Netherlands contends the "your product" exclusion applies because the controversy centers around the dried milk, Main Street's product.  But the district

court found the policy's "your product" exclusion did not apply because Main Street "seeks indemnity not for damage to its milk, . . . but for damage to the [Malt-O-Meal] oatmeal caused by the inclusion of the milk. That the Underlying Action alleged breach of warranties does not change the fact that [Main Street] seeks coverage *for damage to a third-party's product*." (Emphasis added). We agree the plain language of the policy dictates Malt-O-Meal's instant oatmeal is not "your product" under the policy's definition because Main Street did not manufacture, sell, handle, distribute, or dispose of Malt-O-Meal's instant oatmeal. Main Street did not seek indemnification for property damage to its dried milk, but for property damage to Malt-O-Meal's instant oatmeal, that is, the product liability settlement amount with Malt-O-Meal. Malt-O-Meal manufactured a new product that included Main Street's product as an inseparable ingredient such that the damage was to Malt-O-Meal's entire product, which could not be alleviated by repair or replacement of Main Street's product. The dried milk, once incorporated, could not be separated from the other ingredients in the instant oatmeal.

The case that comes closest to supporting Netherlands' position is Bright Wood Corp. v. Bankers Standard Insurance Co., 665 N.W.2d 544 (Minn. Ct. App. 2003). There, a supplier of wood window sash components, Bright Wood, failed to treat them with preservative. See id. at 546. The customer, a window manufacturer, had to repair or replace the windows made with the faulty wood parts, but the court found the "own product" exclusion in Bright Wood's policy with the defendant insurer applied. See id. at 546-49. Unlike Main Street's situation, "[t]he damage . . . [was] based solely on Bright Wood's defective product. The incidental damage to the [customer's] finish, hardware, and weather-stripping was incurred only in order to make repairs. *No evidence was introduced of damage to any product other than Bright Wood's components*, except insofar as the non-Bright Wood components incurred damage during the repair process." Id. at 548-49 (emphasis added). The present case is distinguishable, because, as found above, Malt-O-Meal's instant oatmeal did suffer property damage. The district court correctly concluded the "your product" exclusion

did not apply, because the property damage claimed was to Malt-O-Meal's product, not Main Street's product.

### 4.     Impaired Property Exclusion

The policy excludes from coverage "property damage" to "impaired property" or "property that has not been physically injured, arising out of":

(1)     A defect, deficiency, inadequacy or dangerous condition in "your product" . . . ; or

(2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

The policy defines "[i]mpaired property" to mean, among other things,

tangible property, other than "your product" . . . that cannot be used or is less useful because:

a.     It incorporates "your product" . . . that is known or thought to be defective, deficient, inadequate or dangerous; or

b.     You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a.     The repair, replacement, adjustment or removal of "your product" . . . ; or

b.     Your fulfilling the terms of the contract or agreement.

The district court correctly found the impaired property exclusion did not apply, for two reasons: first, the instant oatmeal *was not* "impaired property," because it could not "be restored to use"; and second, the instant oatmeal *was* "physically injured."[6]

### 5. Recall Exclusion

The policy excludes from coverage:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of: . . ."[y]our product" . . . if such product . . . is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

We have already concluded the damages sought here were not for the recall—issued by Plainview—of "[y]our product," as defined in the policy. The property damage claim was for Malt-O-Meal's property damages. Construing the recall exclusion "strictly against the insurer," as we must, Thommes, 641 N.W.2d at 880, we conclude the district court correctly found the exclusion does not apply.

## III. CONCLUSION

Because Main Street's loss is covered under the policy and no exclusions apply, we affirm the decision of the district court.

_____

___

[6]Netherlands concedes the impaired property exclusion would only come into play if the court were to find the instant oatmeal was damaged due to "loss of use," rather than physical injury. The district court did not evaluate "property damage" due to "loss of use."