**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,<br><i>Plaintiff-Appellee</i>,<br><br>v.<br><br>ROXANNE LYNN EYRAUD,<br><i>Defendant-Appellant</i>.</td><td>No. 14-50261<br><br>D.C. No<br>3:12-cr-02998-L-1<br><br><br>OPINION</td></tr>
</table>

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, Senior District Judge, Presiding

Argued and Submitted
September 3, 2015—Pasadena, California

Filed October 22, 2015

Before: Diarmuid F. O'Scannlain, Stephen S. Trott,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Trott

**SUMMARY**[*]

**Criminal Law**

The panel affirmed the district court's restitution order in a case in which the defendant, who pled guilty to bank fraud, stole $264,824.10 from her employer Rhino Building Services (RBS).

The panel explained that the restitution authorization in 18 U.S.C. § 3663A(b)(4) covers the entirety of attorneys' fees awarded to RBS, not just those incurred leading up to and during the grand jury proceedings, where RBS incurred those fees as part of its continuing investigation of the extent of the defendant's thievery. The panel held that the district court's findings and determinations are fully supported by the evidence. The panel wrote that contrary to counsel's claim about the district court's supposed ignorance of the "reasonably necessary" test, the district court was manifestly aware of the law governing an award of attorneys' fees. The panel held that the district court properly concluded that RBS's taxes and penalties were foreseeable and directly and proximately caused by the defendant's embezzlement. The panel wrote that the district court had no obligation to defer to any abatement of penalties negotiated between RBS and the IRS.

The panel wrote that contrary to counsel's argument, the district court did not, in reducing RBS's requested attorneys' fees by $53,148.50, conclude that the fees incurred were not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reasonably necessary, just that the billing rate charged was too high.

The panel rejected the defendant's statutory and due process challenges to the district court's reviewing counsel's original billing invoices in camera.

The panel rejected as foreclosed the defendant's argument that after *Paroline v. United States*, 134 S.Ct. 1710 (2014), a jury, not a judge, must make the factual findings that support an order of restitution.

## COUNSEL

Joseph S. Camden (argued), Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney, Peter Ko, Assistant United States Attorney, Chief, Appellate Section Criminal Division, Melanie K. Pierson (argued), Assistant United States Attorney, United States Attorneys' Office, San Diego, California, for Plaintiff-Appellee.

## OPINION

TROTT, Senior Circuit Judge:

### I

Over a two-year period, Roxanne Eyraud stole $264,824.10 from her employer Rhino Building Services ("RBS"). Her embezzlement scheme involved writing extra

payroll checks both to herself and to other unknowing employees. She forged her employer's signature on the checks, cashed them, and kept all the money for herself. Also, she mischaracterized thirty-four entries in RBS's Quickbooks accounting program as tax payments made by company check to the Internal Revenue Service ("IRS") covering the period from November, 2006 to June, 2008. These bogus checks totaled $82,348.90 – money owed to the IRS but not remitted. The phantom check payments entered into Quickbooks were actually made payable to and cashed by Eyraud. She hid the paper checks to conceal her forgery.

RBS discovered part of Eyraud's theft in 2008 when an auditor spotted approximately $150,000 worth of bogus checks. She confessed and covered the loss with $150,000 from a well-to-do relative. Eyraud did not alert RBS to the approximately $145,887.97 the auditor had not yet spotted, nor did she tell the company she had kept for herself the money listed in Quickbooks as paid to the IRS. The rest of Eyraud's thefts came to light in 2010.

## II

Pursuant to a negotiated agreement, Eyraud pleaded guilty to bank fraud in violation of 18 U.S.C. § 1344, one count of a ten count indictment. The court eventually sentenced her to time served with three years of supervised release. In addition, the court ordered her to pay restitution to RBS in the amount of $425,445.44. This total included (1) $114,224.10 in unrecovered stolen money, (2) $128,372.02 in tax deficiencies and penalties caused by her fraud, (3) $9,052 for forensic accounting fees, and (4) $173,797.32 in attorneys' fees.

**III**

Because the March 11, 2013, plea agreement was negotiated before RBS's full loss had been calculated, the agreement obligated the government to recommend restitution in the amount of only $145,887.97. This number represented Eyraud's embezzled funds not yet repaid ($114,824.10) and the resulting tax penalties and interest known as of the date of the agreement ($31,063.87). The sum did not include RBS's attorneys' fees. On June 5, 2013, the Probation Office informed the court that RBS would be seeking considerably more in restitution than the amount specified in the plea agreement. Attorneys' fees now became an issue.

At a sentencing hearing on September 23, 2013, RBS appeared in court with private counsel to justify its request for additional restitution. RBS's appearance triggered a series of additional hearings and multiple dueling submissions by both RBS and Eyraud. On March 27, 2014, RBS supplemented its request with twenty-six invoice summaries – not the original invoices themselves – for attorneys' fees paid by RBS showing the attorney involved, the number of hours worked, and the hourly rate of each attorney. RBS also produced an eight-page sworn declaration from their attorney explaining his law firm's billing policy, the extent of the legal and investigative work performed, and the resumés of the attorneys who performed the work, as well as a summary of the tax damage done to RBS by Eyraud's scheme, calculated by quarter. Counsel's declaration asserted that the withheld original invoices contained information protected by both the attorney client and/or work product privileges.

At a contested hearing on April 3, 2014, RBS refined its request, and the court took the issue of restitution under submission, setting Eyraud's sentencing for April 24, 2014. Because of its plea agreement, the government continued to sit on the restitution sidelines.

On April 21, 2014, the court asked for the original invoices relating to the summaries previously submitted. The court said that it wanted to review the "billing rate and work completed by each attorney . . . ." On April 23, 2014, RBS filed the requested documentation *ex parte*, "for court's eyes only," and in camera, once again asserting the attorney client and/or work product privileges regarding "communications and information" in the originals.

On April 24, the court sentenced Eyraud, but set a later date to determine attorneys' fees and prejudgment interest. The court denied Eyraud's counsel's request for the original invoices, saying, "Well I'm not inclined to turn over the billing records, but when I rule, I will . . . explain my ruling to such a degree that you would be able to make any objections."

Final judgment day arrived on May 29, 2014, almost one year after RBS entered the fray on its own behalf.

In explaining its analysis and findings of fact and conclusions of law, the court indicated that the "backup billing documentation" RBS had provided was consistent with the invoice summaries. The court added that the attorneys had been careful not to include any fees not related to Eyraud's criminal case. True to its promise, the court explained its ruling in thoughtful detail. Counsel renewed his objection to the court's decision not to give him access to the

original invoices. Counsel voiced his understanding that "implicit in the . . . [court's] order" was a denial of his assertion that the material he sought was not protected by any privilege.

# IV

## Issues

Eyraud presents us with six issues. First, whether the district court "erred in concluding that the attorneys' fees incurred by RBS were reasonably necessary." In his reply brief, however counsel takes a different tack, now claiming that the district court failed to apply the "reasonably necessary" test, and was ignorant of the test altogether.

Second, whether the court denied statutory and constitutional due process to Eyraud in denying access to the original billing invoices submitted in camera by RBS.

Third, whether the district court failed to account for $85,402.32 in the amount of attorneys' fees awarded.

Fourth, whether the court erred in finding that RBS's tax penalty and interest loss were proximately caused by Eyraud's conduct.

Fifth, whether the IRS's abatement of 30% of the delinquent tax payments and interest was the true measure of Eyraud's damage to RBS, not the 70% Eyraud paid to the government.

Sixth, whether after *Paroline v. United States*, 134 S.Ct. 1710 (2014), a jury, not a judge, must make the factual findings that support an order of restitution.

## V

## Standard of Review

We review the district court's restitution order "for an abuse of discretion, provided it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error." *United States v. Waknine*, 543 F.3d 546, 555 (9th Cir. 2008) (citation omitted). We review de novo Eyraud's due process claims.

## VI

## Attorneys' Fees

### A.  The Law

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires a district court to "order a defendant to make restitution to a victim of certain specified offenses." *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013)(citation omitted). The amount of restitution is limited to the victim's "actual losses" that are a direct and proximate result of the defendant's offense. *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010). The MVRA lists certain losses that are undoubtably compensable, including "expenses incurred during participation in the investigation or prosecution of the offense." § 3663A(b)(4). However, so long as any loss – not just those incurred during investigation or prosecution – is an "actual loss" suffered as

a result of a defendant's qualifying crime and the MVRA's causation standard is satisfied, a district court must include the amount of that loss in its restitution order. *See Hunter*, 618 F.3d at 1064; *United States v. Peterson*, 538 F.3d 1064, 1074 (9th Cir. 2008).

Normally but not exclusively, the government proves the amount of loss and causation by a preponderance of the evidence. *See Peterson*, 538 F.3d at 1074–75. However, the statute setting the procedure for awarding restitution under the MVRA, 18 U.S.C. § 3664, also "authorizes the district court to allow a victim to prove up its own claim for restitution when the court deems it appropriate to do so." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 924 (9th Cir. 2001).

When a victim does prove up its claim, it does not do so as a formal party to the proceedings, but as someone damaged by the defendant's crime. *Id.* at 924–25; §§ 3663(a)(1)(A); 3664(a). We note that in *Gamma Tech*, the government vigorously *opposed* allowing the third-party victim to bring its own restitution request. *See Gamma Tech*, 265 F.3d at 922. Here, RBS was similarly left to fend for itself in its request for restitution because the government's earlier plea deal with Eyraud tied its hands.

A meaningful difference exists between the role a victim like RBS plays at a restitution hearing and that of the prosecutor. *See United States v. Alverson*, 666 F.2d 341, 349 (9th Cir. 1982). The victim's interest is focused on making itself whole. The non-party victim does not advocate for a larger fine or longer prison sentence. And even if the victim were to do so, the district court would be powerless to

increase the amount of restitution for solely punitive reasons. *See Hunter*, 618 F.3d at 1064.

## B. Analysis

The law is settled that a court may include attorneys' fees in a restitution order when the victim incurred the expenses to participate in law enforcement's investigation and prosecution of a defendant. *See* § 3663A(b)(4); *United States v. Gordon*, 393 F.3d at 1044, 1057 (9th Cir. 2004). To qualify as investigation costs under § 3663A(b)(4), the fees must be "reasonably necessary" to aid in the investigation or prosecution of the defendant. *See Waknine*, 543 F.3d at 559. This principle covers the portion of attorneys' fees that RBS incurred during its initial criminal investigation alongside the FBI into Eyraud's fraud and during the grand jury proceedings. *See Gordon*, 393 F.3d at 1057 (approving "investigation costs [that] were incurred in response to five grand jury subpoenas and a number of government requests requiring [the victim] to analyze vast amounts of documentation and electronic information").

However, this is not the end of the story. We have adopted "a *broad* view of the restitution authorization [for investigation costs]," holding that "investigation costs – including attorneys' fees – incurred by private parties as a direct and foreseeable result of the defendant's wrongful conduct may be recoverable." *Gordon*, 393 F.3d at 1056–57 (citations omitted) (alteration in original). For instance, in *United States v. Cummings*, 281 F.3d 1046, 1051–53 (9th Cir. 2002), we concluded that § 3663(b)(4) – the companion statute to § 3663A(b)(4) – was broad enough to serve as the basis for a restitution award for a mother's attorneys' fees in a separate child custody proceeding where the father had

improperly retained the children abroad. We have concluded that the MRVA is similarly expansive. *See United States v. Hayward*, 359 F.3d 631, 642 (9th Cir. 2004) (holding that parents were entitled to restitution under § 3663A(b)(4) for "reasonable costs in obtaining the return of their victimized children from London and in making their children available to participate in the investigation and trial").

The textual reach of § 3663A(b)(4) manifestly covers the entirety of the attorneys' fees awarded to RBS, not just those incurred leading up to and during the grand jury proceedings. RBS incurred those fees as part of its continuing investigation of the extent of Eyraud's thievery. Eyraud created the need for this investigation by concealing the full measure of her wrongdoing when she was first confronted and then cutting a favorable deal with the government before RBS discovered the extent of her crime. Because she had disguised her scheme through multiple false entries in the company's Quickbooks and tax ledger, Eyraud should have anticipated – especially after her lack of candor – that unearthing the full consequences of her embezzlement would take additional time, effort, and money.

As *GammaTech* holds, a victim may prove up its own claim for restitution. Section 3664(d)(4) invites a victim seeking recompense privately to submit in camera information and documents revealing the full amount of a loss. In light of the MVRA's broad remedial purpose and the statutes implementing that purpose, it stands to reason that the term "investigation" must cover a victim's reasonable investigation, not only one conducted by a government agency. Consequently, the award of attorneys' fees to RBS was proper.

An examination of the district court record through the prism of the relevant statutes and cases reveals no error or failure to exercise appropriate discretion.  The court's consideration of RBS's interests as well as Eyraud's was thorough and a model of careful due process.  The court's findings and determinations are fully supported by the evidence, including the court's decision about RBS's tax penalty and interest loss.  Eyraud's cooked Quickbooks were directly responsible for the IRS penalties incurred by RBS. Contrary to counsel's claim about Judge Lorenz's supposed ignorance of the appropriate test, the court was manifestly aware of the law governing an award of attorneys' fees.

Moreover, the court properly concluded that RBS's taxes and penalties were foreseeable and directly and proximately caused by Eyraud's embezzlement, with no break in the chain of causation.  An intervening cause that is not "directly related to the offense conduct" will sever the causal chain. *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999); *see also Gamma Tech*, 265 F.3d at 928 ("The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.").  Nevertheless, the "[d]efendant's conduct need not be the sole cause of the loss," and "we have approved restitution awards that included losses at least one step removed from the offense conduct itself." *Id.*

In *United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008), we rejected an argument similar to Eyraud's.  There, homebuilders were convicted of submitting gift letters that falsely claimed that borrowers had received the down payments for HUD-insured home loans from their relatives, rather than from the homebuilders. *Id.* at 1067–69. When the borrowers defaulted on their loans, the district court ordered

the homebuilders to compensate HUD for its losses. The homebuilders argued that HUD's losses were caused by the borrowers defaulting on the loans, not the fraudulent gift letters. *Id.* at 1077. We held that the borrowers' default was not a superceding cause that relieved the homebuilders' restitution obligation because the borrowers would not have qualified for the loans in the first instance without the false letters. *Id.*

Similarly, Eyraud's fraud was the first link in the causal chain. The period for which RBS sought to recover its tax deficiencies and losses began at a time when it was current on its taxes. It was only after Eyraud depleted RBS's coffers and entered false tax payments on the books that RBS again fell behind on its payments to the IRS. As the district court found, Eyraud's theft "created the circumstances under which the harm or loss occurred." *Meksian*, 170 F.3d at 1263 (quoting *United States v. Spinney*, 795 F.2d 1410, 1417 (9th Cir. 1986)). Moreover, RBS's restitution request focused on the time period most directly related to Eyraud's losses. As a result, it was reasonable to hold Eyraud responsible for RBS's taxes that had gone unpaid and the penalties incurred as a result of Eyraud's fraud.

Contrary to Eyraud's assertion, the negotiated amount of the IRS's abatement did not relieve the court of its responsibility to determine the amount of loss. *See* § 3664(f)(1)(A) (commanding that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court"). Quite simply, the IRS did not determine the amount of restitution owed to RBS because of Eyraud's fraud, and the district court had no obligation to defer to any reduction in penalties negotiated between RBS and the IRS.

Furthermore, by examining the original invoices, the court reduced RBS's requested attorneys' fees by $53,148.50. Contrary to counsel's unsupported argument, the court did not conclude in making this reduction that the fees incurred were not reasonably necessary, just that the billing rate charged was too high.

Counsel's assertion that the court overlooked $85,405.32 of RBS's request is without merit. The colloquy between court and counsel reveals without ambiguity that the court had approved the requested total minus the familiar lodestar reduction. Counsel said he understood the amount being requested and that the court had approved was "a total of $226,995.32." At the time, counsel said nothing about a missing $85,405.32, and he did not respond when the court said, "I can be more specific as far as the amounts of money by the different attorneys. I don't know if that's what you're interested in." One wonders why counsel did not timely raise this question during the hearing when given the opportunity to request clarification on the precise amounts awarded.

As the district court explained at the restitution hearing, RBS's requested attorneys' fees included $35,162.50 in "grand jury billings" and $71,265.00 for "restitution billing," two figures that total to $106,427.50. The court went on to explain that after reducing the attorneys fees via the lodestar method, the court had landed on $173,797.32 as the final amount owed. Though Eyraud's math is not quite accurate, what we gather to be counsel's contention is that there is a gap between the attorneys fees that the district court explained orally at the restitution hearing ($106,427.50) and the attorneys fees later awarded by the district court ($173,797.32).

The transcript demonstrates that the district court was not attempting to give a thorough accounting of every invoice submitted by RBS, but rather highlighting several of RBS's primary requests.  Indeed, the court only orally discussed invoices 8, 9, and 11–21, leading us to the obvious inference that invoices 1–7 and 10 contained additional billing requests that the court did not orally address.  If counsel had wanted further clarification, he should have requested it when given precisely that opportunity.

## VII

### Due Process

### A.  Statutory Procedure

Counsel argues that his client had a statutory right to access counsel's original invoices.  18 U.S.C. § 3664 and Federal Rule of Criminal Procedure 32 govern how a restitution award is set.  § 3664(c).  Under § 3664(a), a district court must order the probation officer "to obtain and include in its presentence report, or in a separate report, . . . information sufficient for the court to exercise its discretion in fashioning a restitution order."  Once the report is complete, § 3664(b) requires the district court to "disclose to both the defendant and the attorney for the Government all portions of the presentence or other report . . . described in subsection (a) of this section" – in other words, the reports *that probation prepared*.

Counsel relies entirely on subsections (a) and (b) to argue that the district court improperly reviewed the billing statements in camera.  His argument is patently flawed.  Those sections are inapposite.  RBS's in camera invoices

were *not* part of probation's report. They were submitted separately to comply with the district court's careful order. Therefore, the applicable subsection is (d)(4), not subsections (a) and (b). Subsection (d)(4) says, "After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera." This section *requires* the district court to protect the privacy of RBS's submissions "to the greatest extent possible," and specifically authorized the submission of the documents in camera. Accordingly, there was no statutory error.

## B. Due Process

We begin by noting that counsel did not protect the record on this issue by asking the district court for a protective order preserving the original invoices under seal so they might be reviewed on appeal. 9th Cir. R. 27-13. This lapse leaves us with the district court's description of them as simply corroborative of what counsel already had seen. That being the unchallenged state of the record, Eyraud was not denied due process – unless we were to conclude somehow that § 3664(d)(4) is unconstitutional on its face, which we do not.

To date, no circuit to consider the argument has concluded that the Due Process Clause requires full disclosure of all the information relied on by a court at sentencing. *Stewart v. Erwin*, 503 F.3d 488, 495 (6th Cir. 2007) (observing "the federal appellate courts that have considered this issue have uniformly concluded that" Supreme Court precedent "do[es] not recognize such a federal due process right to full disclosure"); *United States v. Curran*,

926 F.2d 59, 62 (1st Cir. 1991) ("[T]here is no judicial precedent which holds that the Due Process Clause requires disclosure of all information relied upon by the sentencing court."). We have endorsed a similar conclusion in *United States v. Baldrich*, 471 F.3d 1110, 1114–15 (9th Cir. 2006), where we considered the constitutionality of Federal Rule of Criminal Procedure 32(e)(3) which permits a district court to withhold probation's sentencing recommendation from the defendant. We held that Rule 32(e)(3) does not violate due process, so long as a defendant is appraised of the "factual information underlying" the recommendation. *Id.* at 1114. A similar principle governs this case.

Prior to sentencing, Eyraud had access to the law firm's declaration describing the work it performed relating to Eyraud's fraud and the invoice summaries listing the amount of time that work took. The district court confirmed that those documents accurately reflected the pertinent information contained in the privileged billing records. Thus, counsel had "the factual information underlying" the ruling. *Baldrich*, 471 F.3d at 1114. With this information in hand, Eyraud was able to challenge the legal basis for the court's order. Eyraud was afforded adequate notice and a meaningful opportunity to be heard.

Finally, *United States v. Green*, 722 F.3d 1146 (9th Cir. 2013), forecloses counsel's pro forma invocation of *Paroline v. United States*, 134 S.Ct. 1710 (2014), to undo the district court's work. We held in *Green* that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), does not apply to restitution orders, and *Paroline* does not invalidate that holding.

**AFFIRMED.**