# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2139

_____

ResCap Liquidating Trust

*Plaintiff - Appellee*

v.

Primary Residential Mortgage, Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: February 15, 2022
Filed: February 2, 2023

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

The majority of U.S. residential mortgages are financed by a "securitization" process in which mortgage lenders (originators) obtain funds to make future mortgage loans by pooling large numbers of existing loans and selling them to a trust. The trust acquires a right to receive the stream of future mortgage payments, which it then parcels into certificates that are sold to investors, called certificate holders, with the mortgage loans serving as collateral for the certificates. See BlackRock Fin. Mgmt.

Inc. v. Segregated Account of Ambac Assur. Corp., 673 F.3d 169, 173 (2d Cir. 2012), and cases cited. The market for residential mortgage-backed securities ("RMBS") boomed after 2003, but the 2008 financial crisis had a profound negative effect on U.S. real estate and credit markets. This appeal is one small part of the RMBS financial havoc that followed.

## I. The Preamble

In the decade leading up to the 2008 crisis, Residential Funding Company, LLC ("RFC"), an affiliate of Ally Financial, Inc., was a middleman or "sponsor" in the RMBS market, purchasing mortgage loans from hundreds of originators and selling them in pools to hundreds of trusts for securitization. Each securitization process began with RFC entering into an Assignment and Assumption Agreement with a depositor entity in which RFC made representations and warranties concerning the individual loans in the pool. The depositor then sold the loans to RMBS Trusts in Pooling and Servicing Agreements that assigned RFC's representations to the trusts and often contained additional loan-level representations. RFC also contracted with four "monoline" insurers (the "Monolines") to insure principal and interest payments on some of the RMBS certificates in contracts in which RFC warranted that representations made to the RMBS Trusts were true.

Prior to 2008, Primary Residential Mortgage, Inc. ("PRMI"), a Nevada corporation, was an originator that sold mortgage loans to RFC in transactions governed by two "Client Contracts," one entered into in March 2000 and another in June 2001. The contracts incorporated the terms of RFC's more detailed "Seller Guides."[1] The Guides required PRMI to make specific representations and warranties

---

[1]The March 2000 contract incorporated a version of the Guides called the AlterNet Guide, which governed loans sold from March 2000 to June 2001. The June 2001 Client Contract incorporated a newer version, the Client Guide, which governed all subsequently sold loans.

about the characteristics and underwriting of the loans being sold, and gave RFC broad remedies for an Event of Default,[2] including repurchase and indemnification. Between 1999 and 2007. PRMI sold over 2,300 loans to RFC.

After the housing market collapse in 2008, loans underlying RFC securitizations began defaulting at a high rate, leading to significant losses to trust investors and the Monolines. They began suing RFC and its affiliates, alleging breach of RFC's representations and warranties and misrepresentation. Groups of RMBS Trust investors also threatened RFC with litigation. In May 2012, RFC filed for Chapter 11 bankruptcy protection in the Southern District of New York. In the Chapter 11 proceedings, RMBS trustees filed hundreds of claims for over 1,000 securitization trusts against the Chapter 11 estate, and the Monolines filed their own proofs of claim. The day before filing, RFC entered into a settlement agreement with RMBS Trust investor groups resolving claims by 392 RMBS Trusts created between 2004 and 2007. RFC sought bankruptcy court approval of the pre-bankruptcy settlement. Parties not included in the agreement, including RMBS trusts, objected.

After months of litigation and mediation, the parties to the Chapter 11 proceeding agreed to a Plan Support Agreement and submitted a proposed Final Chapter 11 Plan (the "Plan"), which included an unallocated allowed claim of $7.091 billion for all RMBS Trusts, a $209.8 million allowed claim against RFC's affiliate GMAC Mortgage, and allowed claims for each of the Monolines. The bankruptcy court approved the Plan and the underlying settlements in a December 2013 order. The Plan included creation of ResCap Liquidating Trust ("ResCap"), a Delaware

---

[2]Section A210 of the October 1, 2001 Client Guideline (Def. Trial Ex. 18) broadly defined "Events of Default" to include PRMI breaches of any representation or warranty, failure to perform its obligations under the Client Guide, false representations to GMAC-RFC, failure to provide complete and accurate information, as well as false representations and failure to provide complete and accurate information by the loan borrower or anyone involved in the loan or its underwriting.

statutory trust, to pursue indemnification claims against originators such as PRMI and to distribute any recoveries as assets of the Chapter 11 estate to RMBS Trusts, Monolines, and other creditors.[3] To facilitate distribution, the RMBS Trusts and Monolines exchanged their allowed claims for units in the liquidating trust entitling them to payments if ResCap recovered damages.

In 2013, ResCap began suing originators for indemnification. In 2015, the "First Wave" of suits were consolidated in the District of Minnesota before Judge Susan Richard Nelson. In August 2018, Judge Nelson issued her lengthy Common SJ Order, resolving many common issues in ResCap's favor. Following this Order, only one First Wave case proceeded to trial. The jury returned a verdict in favor of ResCap, and the district court entered judgment for $42.7 million in damages and prejudgment interest and $18 million in attorney's fees. See In re RFC & ResCap Liquid. Tr. Action, 399 F. Supp. 3d 827, 862 (D. Minn. 2019).

## II. This Lawsuit

With First Wave proceedings ongoing, ResCap began filing "Second Wave" suits in the District of Minnesota, including this action against PRMI in December 2016. ResCap again asserted breach of contract and indemnification claims, seeking to recover a portion of the allowed bankruptcy claims for those holding units in the liquidating trust. Assigned most Second Wave cases, Judge Nelson stayed the cases

---

[3]The district court described the complex bankruptcy settlement process in detail in its initial published opinion dealing with ResCap's breach of contract and indemnification claims against originator defendants. See In re RFC and ResCap Liquidating Tr. Action, 332 F. Supp. 3d 1101, 1122-26 (D. Minn. 2018) ("Common SJ Order"). As will become apparent, of great importance in resolving this appeal is the court's ruling, as a matter of law, "that ResCap has met its burden of proving that the Bankruptcy Settlements at issue were reasonable and entered into in good faith." Though PRMI raises numerous issues on appeal, it does not challenge this ruling.

-4-

pending resolution of the pending First Wave summary judgment motions and the single First Wave trial. After she lifted the stay, most Second Wave cases quickly settled. By August 2019, PRMI was the only remaining defendant. Again responding to cross motions, Judge Nelson issued a 97-page order resolving summary judgment issues, adhering to her resolution of common issues in Common SJ Order. See In re ResCap Liquidating Tr. Litig., 428 F. Supp. 3d 53 (D. Minn. 2019) ("PRMI SJ Order"). The Second Wave case against PRMI then proceeded to a 13-day bench trial in February and March 2020.

In its summary judgment orders, the district court ruled that ResCap may use statistical loan sampling in proving its claims for liability and damages, observing that "[e]stablishing liability and damages in this case without the use of sampling would be unmanageable." Common SJ Order, 332 F. Supp. 3d at 1150; see PRMI SJ Order, 428 F. Supp. 3d at 131-33. At trial, ResCap sought relief for 539 "at-issue" PRMI loans, defined as a loan included in the RMBS Trust settlement that, as of May 2013, had $500 or more of losses or was 90 or more days delinquent, in foreclosure, or real-estate owned. Steven Butler, ResCap's reunderwriting expert, testified that he thoroughly reviewed 157 loans that PRMI sold to RFC and concluded that 101 materially breached contractual representations to RFC required by the Client Contract and Seller Guides, including 50 loans that contained "misrepresentations of either debt, income, occupancy or employment."

Dr. Karl Snow, ResCap's damages expert, testified regarding PRMI's proper share of liability for the large RMBS Trust and Monoline bankruptcy settlements, using what he termed the "allocated breaching loss methodology" to estimate indemnifiable losses that RMBS Trusts and Monolines suffered because of PRMI breaches. Dr. Snow's analysis proceeded in four steps, which he conducted separately for the RMBS Trusts and the Monolines.

First, starting with the RMBS trusts, Dr. Snow calculated a total of $40.3 billion in losses on the ResCap loans in the RMBS trusts. Second, using Butler's re-underwriting of a random sample of 410 loans from the overall at-issue population, Dr. Snow determined that 59.7%, or $24 billion, of the $40.3 billion in overall losses were caused by loans that materially breached both the Client Guides *and* the Trust Agreement ("breaching loans"). Dr. Snow calculated the $24 billion in breaching losses based on Butler's determination that 265 of the 410 re-underwritten loans were breaching loans. Third, Dr. Snow determined the overall "settlement factor" -- the "discount" RFC received for the bankruptcy settlement -- was of 28%. Finally, Dr. Snow repeated steps one and two for a loan population limited to the 539 PRMI at-issue loans. Based on expert Butler's reunderwriting of a 150-loan sample of these loans, Dr. Snow calculated there were $35.7 million of total trust losses, a 50.9% breach rate, and therefore $18.2 million in total breaching losses on PRMI At-Issue Loans. Applying the 28% settlement factor, Dr. Snow testified that PRMI's allocated share of the RMBS Trust Settlement was $5.1 million.

Using essentially the same methodology, Dr. Snow testified that PRMI's allocated share of the Monoline Settlements was $401,000. Deducting $100,000 for statistical imprecision, Dr. Snow estimated that the "most likely and conservative estimate" of PRMI's share of the settlements was $5.4 million. Overruling PRMI's objections, the district court approved Dr. Snow's damages methodology, finding it reasonable and nonspeculative. PRMI did not offer a competing damages model.

After the trial, the district court issued its 210-page Findings of Fact and Conclusions of Law in August 2020. The court concluded that ResCap had established by a preponderance of the evidence each element of its contractual indemnification claim -- existence of a contract (the Client Contract and Guides); that PRMI breached the contract; its breaches were a contributing factor in causing RFC losses, damages, or liabilities within the scope of the contractual indemnity; that the bankruptcy settlements for which RFC sought indemnification were reasonable and

entered into in good faith; and the amount of reasonably certain and non-speculative damages ResCap is entitled to recover.  The court accepted the damages allocation methodology of Dr. Snow and entered judgment in favor of ResCap for $5.4 million in damages.  After further briefing, the court awarded ResCap $10.6 million in attorney's fees, $3.5 million in costs, $2 million in prejudgment interest, and $520,212 in what it termed "post-award prejudgment interest" for the period between entry of judgment and the order awarding attorney's fees, costs, and prejudgment interest.

PRMI appeals the district court's final judgment, arguing numerous issues in three main categories: (i) the interpretation of the underlying contracts between PRMI, RFC, the RMBS Trusts, and the Monolines; (ii) the allocation of multi-party damages to PRMI; and (iii) the post-trial award of fees, costs, and interest.  We remand for a recalculation of postjudgment interest but otherwise affirm.

## III.  Contractual Issues

**A. The "Sole Discretion" Issue.**  The Client Guide indemnification provision at issue, Section A212, required PRMI to indemnify RFC for "all losses, damages [etc.] *resulting from any Event of Default*" (emphasis added).  Section 113(B) of the Client Guide, part of the Guide's General Rules of Interpretation not found in the earlier AlterNet Guide, provided:

> Whenever any provision of this Client Guide contract requires []RFC to make a determination of fact or a decision to act, or to permit, approve or deny another party's action such determination or decision shall be made in []RFC's sole discretion.

At summary judgment, ResCap argued this provision gave it sole discretion to determine whether PRMI committed an "Event of Default" for indemnification

purposes. PRMI disagreed, arguing that Section 113(B) in the Client Guide "is not an independent grant of power," and the indemnification provision, Section A212, lacks a grant of this power. The district court granted ResCap summary judgment on this issue, relying on its previous interpretation in the Common SJ Order that the Client Guide's unambiguous grant of "sole, unreviewable discretion to make determinations of fact" includes whether "an Event of Default has occurred." PRMI SJ Order, 428 F. Supp. 3d at 92, citing Common SJ Order, 332 F. Supp. 3d at 1153.

PRMI appeals that ruling, making the same textual arguments and arguing that it should have been allowed to challenge Butler's breach determinations for the loans sold under the Client Guide that he sampled. We have seen this issue before. In Residential Funding Co., LLC v. Terrace Mortgage Co., 725 F.3d 910 (8th Cir. 2013), RFC sued to enforce its repurchase remedy after RFC declared an Event of Default regarding thirteen purchased loans and the originator refused RFC's repurchase demands. As in this case, the repurchase provision of the Client Guide required the originator to repurchase a loan "[i]f []RFC determines that an Event of Default has occurred," and the Client Guide gave RFC "'sole discretion' to determine whether an Event of Default has occurred." Id. at 916. The district court enforced that provision, and the originator appealed, arguing this interpretation "renders most of the contract surplusage," and makes the contract unenforceable for lack of consideration and unconscionability. Id. at 916-17. We affirmed, concluding "[t]here is nothing ambiguous about this [sole discretion] language." Id. at 916. Under Minnesota law, "Terrace cannot contract away judicial review by granting [RFC] the exclusive right to determine an 'Event of Default' has occurred, only to later ask a court to independently review [RFC's] determination." Id. at 915-16.

PRMI argues that our ruling in Terrace Mortgage is not controlling because the indemnification provision, Section A212, lacks a sole discretion provision and the interpretive provision in Section 113(b) is not an independent grant of power but is instead limited to "[w]henever any provision of this Client Guide contract requires

[]RFC to make a determination of fact." Construing these remedial provisions "in the context of the entire contract," as Minnesota law requires, see Quade v. Secura Ins., 814 N.W.2d 703, 705 (Minn. 2012), we disagree.

The Client Guide gives RFC (and therefore ResCap) two interrelated remedies in the event of an originator default, repurchase and indemnification. We held in Terrace Mortgage that RFC may seek the affirmative remedy of demanding the originator repurchase a loan when RFC determines, in its sole discretion, "that an Event of Default has occurred with respect to a specific loan." 725 F.3d at 916, citing Client Guide Section A210(A). But it was not required to seek that remedy. Rather, Section A210(A) provided:

> Where []RFC determines that repurchase of a Loan and/or the servicing is not appropriate, the Client shall pay []RFC all losses, costs and expenses incurred by []RFC . . . as a result of an Event of Default.

Here, given the overwhelming number of defaulted securitized loans following the 2008 market collapse that forced RFC into bankruptcy, it determined (or was forced to determine) that PRMI repurchasing the defaulted PRMI loans "is not appropriate." This was the affirmative "determination of fact" that PRMI erroneously asserts is lacking. And this is a logical interpretation of these alternative remedies. It would make little sense to allow ResCap to conclusively determine an Event of Default for repurchase, but not for the alternative indemnification remedy. Therefore, our interpretation of sole discretion in Terrace Mortgage is controlling even if the general interpretation in Section 113(b), standing alone, would not govern this issue. We conclude the Client Guide gave RFC, and therefore ResCap, the sole discretion to determine an Event of Default for indemnification purposes. We need not and do not consider the district court's broader ruling that RFC has "sole unreviewable discretion to make determinations of fact" in all circumstances. See PRMI SJ Order, 428 F. Supp. 3d at 92 (quoting Common SJ Order, 332 F. Supp. 3d at 1153).

**B. Indemnification for Negligence and Fraud Claims.** ResCap claims that PRMI is contractually obligated to indemnify the Chapter 11 claimants ResCap represents for a share of the RMBS Trust and Monoline claims allowed in the RFC bankruptcy settlements. The parties do not dispute that Minnesota law applies to the interpretation of the Client Contracts between PRMI and RFC, including the incorporated Seller's Guides, as well as to RFC's indemnity claim. The claims by the RMBS Trusts and Monolines that RFC settled included allegations that, when selling loans to the RMBS Trusts, RFC knew or should have known of breaches of the Mortgage Loan Representations and Warranties and that the mortgage loans did not comply with the Mortgage Loan Representations and Warranties. Thus, indemnitee ResCap seeks indemnification for claims based at least in part on its own negligence. "When applying Minnesota law, we strictly construe indemnification agreements that shift liability for the indemnitee's own negligence. An indemnification provision will only be enforceable if its language is clear and unequivocal." Harleysville Ins. Co. v. Physical Distrib. Servs., 716 F.3d 451, 457 (8th Cir. 2013) (quotation and citations omitted).

On appeal, PRMI argues the district court misinterpreted the indemnification provision and misapplied Minnesota law when an indemnitee seeks to recover for its own negligence. In DeWitt v. London Road Rental Center, 910 N.W.2d 412 (Minn. 2018), the Supreme Court of Minnesota held that, for a contract to allow indemnification for the indemnitee's own negligence, it must:

> use express language that clearly and unequivocally shows the parties' intent to transfer liability. . . . The test is therefore not whether the language of an indemnity clause is so broad that it necessarily includes the indemnitee's own negligence. . . . Rather, the proper test is whether the clause includes *specific* language that *expressly* shows . . . that the parties intended the clause to obligate the indemnitor to indemnify the indemnitee for the indemnitee's own negligence.

-10-

Id. at 416-17 (Minn. 2018) (emphasis in original) (quotation omitted); see Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc., 281 N.W.2d 838, 842 (Minn. 1979). Thus, this issue requires a close look at the applicable indemnification provisions in RFC Guides, which were materially identical for all the loans at issue.

Section A202 of the Guides set forth General Rules of Interpretation which included Section A202(II), entitled Loan Securitization:

> The Client recognizes that it is GMAC-RFC's intent to securitize some or all of the Loans sold to GMAC-RFC by the Client. . . . The Client agrees to indemnify and hold GMAC-RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by GMAC-RFC as a result of any material misstatement in or omission from any information provided by the Client to GMAC-RFC; or from any claim, demand, defense or assertion against or involving GMAC-RFC based on or grounded upon, or resulting from such missatement or omission or a breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon such misstatement or omission.

Section A210(A), part of the repurchase provisions, provided:

> Where []RFC determines that repurchase of a Loan and/or the servicing is not appropriate, the Client shall pay []RFC all losses, costs and expenses incurred by []RFC . . . as a result of an Event of Default.

Section A212, entitled Indemnification, provided:

> The Client shall indemnify GMAC-RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from any Event of Default. This includes, without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation

-11-

or representation contained in the Client Contract, (iii) any claim, demand, defense or assertion against or involving GMAC-RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon any warranty, obligation or representation made by the Client contained in the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the Client in information required under Regulation AB or any successor regulation.

In granting ResCap summary judgment on this issue, the district court adhered to its prior ruling that these provisions clearly and unequivocally state that PRMI agreed to indemnify RFC for any claim based on "a breach of any representation, warranty or obligation *made by []RFC* in reliance [on PRMI's] misstatement or omission." 428 F. Supp. 3d at 98 (alteration in original) (quoting Common SJ Order, 332 F. Supp. 3d at 1133). We agree. The at-issue claims in the bankruptcy settlements "result[ed] from" breaches of representations that RFC made in securitizing mortgage loans in reliance upon representations and warranties made by PRMI when it sold the loans to RFC knowing of RFC's intent to securitize. Thus, the claims were "incurred by []RFC . . . as a result of an Event of Default." Given RFC's central role in the securitization process, it was foreseeable to originators such as PRMI that investors suing for losses resulting from RFC as middleman or sponsor acting in reliance on PRMI's misrepresentations would include negligence claims that RFC knew or should have known of PRMI's default, as well as breach of contract and warranty claims. In these circumstances, it is obvious the Guide's indemnification provisions "fairly apprise[d]" PRMI of its obligation to indemnify RFC for all of these claims. DeWitt, 910 N.W.2d at 417 (quotation omitted); see Johnson v. McGough Construction Co., 294 N.W.2d 287, 288 (Minn. 1980).

PRMI further argues that indemnification of fraud claims should be treated differently based on the Minnesota Supreme Court's long disfavor of indemnifying

a party for its own fraud.  PRMI argues that the Guides require indemnification for claims resulting from representations made "in reliance" on PRMI's representations, which precludes fraud claims because fraud requires "knowledge" of falsity.  The district court rejected this contention in its summary judgment order because "in the absence of a judgment or finding of intentional conduct on the part of the indemnitee (i.e. RFC) -- a finding indisputably absent here -- mere claims of intentional misconduct, denials of motions to dismiss fraud claims, or acknowledgment by RFC of the potential risk of a fraud judgment were insufficient to create a threshold finding that RFC engaged in fraud or other intentional misconduct for indemnification purposes."  PRMI SJ Order, 428 F. Supp. 3d at 98-99, citing Common SJ Order, 332 F. Supp. 3d at 1135-37.  On the facts of this case as further developed at trial, again we agree.

**C. Proof of RFC Breaches.**  The Client Guide indemnification provision provided that PRMI must indemnify RFC for "all losses [etc.] resulting from any Event of Default," including "any breach of any representation, warranty or obligation made by []RFC in reliance upon any warranty, obligation or representation made by [PRMI]."  The district court determined that this required ResCap to show PRMI's breaches were a "contributing cause" of the RMBS Trust and Monoline claims.  PRMI SJ Order, 428 F. Supp. 3d at 102-03 (citing Common SJ Order, 332 F. Supp. 3d at 1163-65).  PRMI does not challenge the contributory causation standard on appeal.  After trial, the court's Conclusions of Law held that ResCap needed only to show that "PRMI's breaches increased RFC's risk of liability on the RMBS Trust and Monoline Claims that were settled in Bankruptcy."  PRMI argues this was error because a claim for indemnification of "a breach of any representation, warranty or obligation made by []RFC," required ResCap to prove an actual breach, not just an increased risk of liability.  We disagree.

As the district court noted, PRMI's interpretation of the contributing cause standard would "turn this trial into the very loan-by-loan repurchase trial obviated by

the bankruptcy settlements." Under well-established Minnesota law, pretrial settlement of an indemnitee's own liability to third parties does not defeat an indemnitee's claim for contractual indemnity if the settlement was made "under just terms," in which case the indemnity claimant "would recover less if he settled for less." Minneapolis Mill Co. v. Wheeler, 16 N.W. 698, 699 (Minn. 1883); see Miller v. Shugart, 316 N.W.2d 729, 735 (Minn. 1982); Osgood v. Med., Inc., 415 N.W.2d 896, 903-04 (Minn. App. 1987) ("[T]he party seeking indemnification must show [that a pretrial] settlement was reasonable and prudent."). Here, reasonable, good-faith bankruptcy settlements gave the RMBS Trusts and Monolines global claims for RFC's breaches which ResCap is pursuing against multiple originators. PRMI as indemnitor cannot be liable for more than its appropriate share of RFC's total liability to the Trusts and Monolines, but Minnesota law does not compel ResCap, acting on behalf of the Trusts and Monolines, to prove RFC's breaches on an unmanageable loan-to-loan basis that the settlements enabled the settling parties to avoid. See Neth. Ins. v. Main St. Ingredients, LLC, 745 F.3d 909, 913 (8th Cir. 2014).

**D. RFC Representations.** PRMI argues the district court misinterpreted what PRMI refers to as "pool-wide" representations RFC made to RMBS Trusts and the Monolines, and a representation in many trust agreements that, "to the best of RFC's knowledge . . . there is no default . . . existing under the terms of any Mortgage Note or Mortgage." We have carefully considered these contentions and conclude they are without merit for the reasons explained at length by the district court. See Findings & Conclusions 425-429. Regarding the "pool-wide" representations, the court properly relied on the context of the representations in the agreements, and on ResCap witness testimony about the understanding of the provisions at the time of the contracts. Regarding the "best of knowledge" issue, we agree with the district court that ResCap as a settling indemnitee only needed to show that "it could have been liable" if the RMBS Trusts or Monolines proved that "RFC knew or should have known" about defaults on the underlying loans. Neth. Ins., 745 F.3d at 913.

## IV. Damages Issues

ResCap faced the daunting task of proving PRMI's share of the indemnifiable liabilities RFC incurred in its settlements with the RMBS Trusts and the Monolines. The district court labeled this task the RMBS Trust and Monoline Settlement Allocations. As explained above, ResCap began by limiting the PRMI loans at-issue to 539 of the 2300 loans PRMI sold to GMAC-RFC. The limiting criteria were loans that had $500 or more of losses or were 90 or more days delinquent, in foreclosure, or real-estate owned. Next, ResCap determined a 28% settlement factor for the global settlement. This comports with Minnesota law -- an indemnitee that reasonably settled its liability to third parties may recover from the indemnitor its actual loss, or the amount paid in settlement, *whichever is less*. Minneapolis Mill Co., 16 N.W. at 699. Then, Dr. Snow applied this 28% settlement factor to 50.9% of the total breaching losses -- PRMI's breach rate as determined by expert Butler's reunderwriting – and opined, with adjustments not at issue, that the "most likely and conservative estimate" of PRMI's fair share of the RFC's bankruptcy settlement liability is $5.4 million.

The district court thoroughly reviewed the methodologies of experts Butler and Snow and carefully considered PRMI's thorough cross examination of these experts and the contrary opinions of PRMI's experts. The court concluded that ResCap's allocated breaching loss approach was consistent with Minnesota contractual indemnity law when damages must be apportioned among multiple defendants; that it was approved by the bankruptcy court as fair and reasonable to each trust and its investors; and that it is consistent with other court-approved RMBS settlements, whereas PRMI's objections "invite unfairness, speculation, and false precision." The court also found that Dr. Snow's calculation of damages was reasonable and non-speculative and his estimate of $5.4 million "is the appropriate measure of damages." We review a district court's award of damages for abuse of discretion. See Agrifund, LLC v. Heartland Co-op., 8 F.4th 660, 666 (8th Cir. 2021). No doubt hoping to

side-step this deferential standard of review, PRMI argues the district court "erred in its rulings on allocation of the settlements."

**A.** First, PRMI argues that, because the bankruptcy court's confirmation order discharged RFC from prior claims and liabilities, the bankruptcy court "extinguished" those claims and therefore ResCap may only seek indemnity for what RFC actually paid in bankruptcy, approximately $810 million. On its face, the argument seems preposterous -- the bankruptcy settlements transferred to RMBS Trust and Monoline claimants RFC's right to seek indemnification from originators such as PRMI. To call this "extinguishing" those claims is ludicrous.

The argument gets no life support from the cases on which PRMI relies. They simply stand for the general proposition that a debtor may not seek indemnity for a discharged obligation or for money not actually paid. The district court's summary judgment orders determined that the Guides' indemnification provisions applied to RFC's liabilities, not just its actual losses, and thus ResCap could pursue indemnity on the allowed claims. See PRMI SJ Order, 428 F. Supp. 3d at 93-97 (citing Common SJ Order, 332 F. Supp. 3d at 1158-62). We agree. The Plan transferred all RFC assets, including "Causes of Action" such as indemnity claims, to the liquidating trust. The bankruptcy parties submitted a Plan Supplement that listed ResCap's "Causes of Action," including a claim against PRMI. Obviously, there was no intent to "extinguish" underlying originator liabilities. Cf. Trapp v. R-Vec Corp., 359 N.W.2d 323, 327 (Minn. App. 1984).

**B.** Second, PRMI argues the district court erred in allocating a share of RFC's total liability to PRMI without requiring ResCap to account for the "relative value" of the various claims by RMBS Trusts and Monolines against RFC. The argument is based on two cases involving indemnity claims by an insured seeking to recover from its liability insurer the unallocated amounts paid to settle multiple covered and uncovered third party claims.

In UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co., 870 F.3d 856 (8th Cir. 2017), the insured sought indemnification from an excess liability insurer for a $350 million unallocated settlement of two separate suits, only one of which was covered under the policy. Id. at 860-62. We held that UnitedHealth did not meet its *prima facie* burden to prove coverage under Minnesota law because it failed "to allocate the settlement between the potentially covered *AMA* suit and the non-covered *Malchow* suit with enough specificity to permit a reasoned judgment about liability." Id. at 863. In King's Cove Marina, LLC v. Lambert Com. Construction LLC, 958 N.W.2d 310 (Minn. 2021), another case in which an insured sought insurer indemnity for the settlement of multiple unallocated claims, the Supreme Court of Minnesota cited UnitedHealth and adopted "a similar allocation test." Id. at 324. The Court held that, in determining the reasonableness of an unallocated Miller-Shugart settlement containing both covered and uncovered claims, the trial court should first find that the settlement is reasonable, considering both claims, and then must consider "how a reasonable person in the position of the insured would have valued and allocated the covered and uncovered claims at the time of the settlement." Id. at 323-24.

Applying these authorities, PRMI argues that Dr. Snow was required to account for the "relative value" of each individual RMBS Trust and Monoline claim in the bankruptcy settlements and in particular, the relative strength of a statute-of-limitations defense that RFC could have asserted against the earlier RMBS Trusts that were not a part of the Pre-Bankruptcy Settlement, when most PRMI loans were sold to RFC. The district court rejected this contention in its summary judgment rulings. See PRMI SJ Order, 428 F. Supp. 3d at 143-44, citing Common SJ Order, 332 F. Supp. 3d at 1203-04. In its post-trial Findings and Conclusions, the court distinguished UnitedHealth on its facts and again approved the allocated breaching loss methodology, noting that UnitedHealth did not "alter long-standing Minnesota law on the allocation of damages," and that "trying to assign numerical values to legal defenses is speculative and leads to false precision." We agree.

Under Minnesota law, damages must be proven with "reasonable certainty" to allow a reasoned judgment on liability. Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 921 (Minn. 1990). In UnitedHealth and King's Cove, the insured, by not allocating the settlement of multiple covered and uncovered claims, created a likelihood that the insurer would be required to indemnify *uncovered* claims, claims that it had *no* contractual obligation to indemnify. By contrast, here the district court determined that *every* RMBS Trust and Monoline claim is indemnifiable under RFC's Seller Guides. This distinguishes UnitedHealth and King's Cove. There is no risk that the damages awarded will indemnify ResCap for claims which PRMI had no obligation to indemnify RFC under the Seller's Guides.

Moreover, unlike the unallocated settlements in UnitedHealth and King's Cove, the Chapter 11 Plan allocated the aggregate allowed claim *pro rata* among the RMBS Trusts and Monoline claimants based on the amount that RFC's material breaches contributed to their net losses. To simplify their complex negotiations, the settling parties did not assign different rates to claims from different RMBS Trusts based on the relative strength of RFC's possible legal defenses. After thoroughly reviewing the bankruptcy court settlement and approval proceedings, the district court concluded that RFC adequately considered the strength of the statute-of-limitations defense in negotiating a bankruptcy settlement that was reasonable as a matter of law. See PRMI SJ Order, 428 F. Supp. 3d at 82-85. Minnesota law required no more. See King's Cove, 958 N.W.2d at 323; Miller v. Shugart, 316 N.W.2d 729, 735 (Minn. 1982). To rule that ResCap may only recover indemnity claims the RMBS Trusts and Monoline claimants acquired in the bankruptcy settlements if it undertakes this claim-by-claim "relative value" inquiry would frustrate the settlements.

In awarding ResCap $5.4 million in indemnification damages, the district court properly resolved the key inquiry, finding that "Snow's calculation of damages was reasonable and non-speculative," and that his methodology produced a reasonably certain measure of ResCap's indemnifiable damages. We uphold the damages award.

-18-

## V. Post-Trial Issues

PRMI challenges the district court's post-trial award of attorney's fees, costs, and prejudgment interest. The parties agree the Seller's Guide requires PRMI to indemnify ResCap for "court costs and reasonable attorneys' fees." PRMI contests the procedure used by the district court to determine reasonableness, the reasonableness of the amounts awarded, and the court's authority to award a portion of the prejudgment interest under state law. We review procedural issues and the award of attorney's fees for abuse of discretion. Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005). The authority to grant prejudgment interest is a question of law we review *de novo*. Adams v. Toyota Motor Corp., 867 F.3d 903, 918 (8th Cir. 2017).

ResCap petitioned the district court for an award of $14.16 million attorneys' fees and costs from December 2014 to July 2020: $6.7 million for national RMBS counsel, $3.7 million for local counsel, $189,205 for bankruptcy counsel, and $3.5 million for experts and other costs. ResCap submitted declarations in support by national and local counsel, and by ResCap's Chief Financial Officer describing how she allocated invoices for tasks common to Wave One and Wave Two *pro rata* among defendants and how she used this information and work done on PRMI-specific tasks to calculate the requested award. ResCap provided the court, *in camera*, law firm invoices from November 2019 through March 2020, representing the months immediately before and during the bench trial, with narrative descriptions of tasks performed redacted, sometimes heavily, allegedly to protect attorney-client privilege and attorney work product. Instead of invoices, ResCap sent PRMI "workbooks" for other periods of litigation, listing hours logged and how common tasks were allocation to ResCap, but omitting narrative descriptions of the work.

PRMI objected to this submission, arguing the materials provided were insufficient for it to contest the requested award. PRMI requested an order requiring ResCap to remove redactions of non-privileged, non-protected information; for

-19-

privileged or protected information, to provide short, general explanations of the work or tasks in question; and to produce law firm invoices from January through October 2019 and April 2020. As it had done in the First Wave HLC case, see 399 F. Supp. 3d at 845-46, the district court declined the requests for revised redactions and a "privilege log" and conducted an *in camera* review of a sample of redacted invoices to determine whether ResCap had properly redacted attorney-client privilege and attorney work product information. PRMI then submitted its objections to ResCap's fee request, including declarations from PRMI's counsel and fee expert, again arguing ResCap had not provided adequate documentation and expanding its request to include all law firm invoices beginning in December 2014.

In its 103-page Amended Order on Attorney's Fees, Costs, and Prejudgment Interest, the district court adhered to its ruling that ResCap's redactions were proper "given that the parties remain adverse," and explained why it rejected PRMI's argument that the redactions "hindered PRMI's ability to properly challenge the billing records." The court explained that "the goal in evaluating and potentially awarding a fee request is to 'do rough justice, not to achieve auditing perfection,'" quoting Fox v. Vice, 563 U.S. 826, 838 (2011). The court then reviewed at length PRMI's detailed challenges to the reasonableness of work performed and fees requested by ResCap counsel during ten discrete stages of the protracted litigation from December 1, 2014, to December 2020. Applying the "lodestar" method of calculating fees -- multiplying the reasonable number of hours spent by a reasonable hourly rate -- the court awarded $14,081,616.31 in attorney's fees and costs. See Milner v. Farmers Ins. Exch., 748 N.W.2d 608, 620-21 (Minn. 2008), citing Hensley v. Eckerhart, 461 U.S. 424 (1983).[4]

---

[4]Under Minnesota law, the lodestar method applies to contractual attorney's fee provisions. See Northfield Care Ctr., Inc. v. Anderson, 707 N.W.2d 731, 735-36 (Minn. App. 2006).

**A.** *In Camera* **Review of ResCap Invoices.**  On appeal, again no doubt hoping to side-step a deferential standard of review, PRMI argues the district court violated its constitutional right to due process by refusing to compel ResCap to provide PRMI with unredacted copies of all law firm invoices underlying the requested fee award.  For authority, PRMI cites a Ninth Circuit decision for the proposition that "an opposing party normally has a *right* to see the timesheets on which a district court relied in issuing a fee award."  Yamada v. Nobel Biocare Holding AG, 825 F.3d 536, 544 (9th Cir. 2016) (emphasis added).

We do not read Yamada so categorically.  The court in Yamada allowed the use of redacted timesheets.  And significantly, the reported decision includes an Order amending the original filed opinion by adding the word "normally" and footnote 7, to distinguish Yamada from an earlier Ninth Circuit decision, United States v. Eyraud, 809 F.3d 462, 471 (9th Cir. 2015), in which the court held the district court did not violate due process in awarding *criminal* restitution based on its *in camera* review of a victim's law firm invoices because the defendant "had access to the law firm's declaration describing the work it performed . . . and the invoice summaries listing the amount of time that the work took."  Yamada, 825 F.3d at 539 (cleaned up).  In acknowledging that *in camera* review may afford due process, Yamada applied a due process standard for civil litigation that is consistent with the law of this Circuit.  Like the Tenth Circuit, "[w]e review the district court's discovery decisions for abuse of discretion and will reverse only if [PRMI] makes a clear showing that the denial of discovery resulted in actual and substantial prejudice."  Garcia v. Tyson Foods, Inc., 770 F.3d 1300, 1309 (10th Cir. 2014) (cleaned up); see Minnesota Supply Co. v. Raymond Corp., 472 F.3d 524, 545 n.14 (8th Cir.2006); accord Mattel, Inc. v. MGA Ent., Inc., 705 F.3d 1108, 1111 (9th Cir. 2013).

Applying this standard, we conclude the district court did not abuse its broad procedural discretion.  PRMI's briefs on appeal complain at length about the "unfairness" of not being able to review redacted law firm invoices the court

-21-

reviewed *in camera*. But PRMI fails to even address, much less convincingly refute, the district court's finding that ResCap's redactions did not "hinder[] PRMI's ability to properly challenge the billing records." As the district court put it, PRMI's "claim that the redactions render it unable to assess Plaintiffs invoices 'blinks reality.'"

**B. Reasonableness.** PRMI next contests the overall reasonableness of the district court's award of attorney's fees and costs, emphasizing that the amount awarded was "grossly disproportionate" to the results ResCap obtained -- $14.08 million in fees and costs versus $5.4 million in damages (disregarding the award of substantial prejudgment interest). To determine reasonableness under the lodestar method, Minnesota courts consider several factors: "the time and labor required; the nature and difficulty of the responsibility assumed; the amount involved and the results obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel and the client." Milner, 748 N.W.2d at 621 (cleaned up).

The district court considered each of these factors. It focused heavily on the "amount involved and the results obtained," comparing this case to the HLC case previously litigated by ResCap's counsel to a favorable trial verdict. The court noted the complexity of the First Wave and Second Wave ResCap litigation (overlap and uncertainty persisted because HLC was still on appeal until October 2020); counsel's efforts to avoid repetitive work; and the detailed loan-by-loan analysis required before and during the PRMI trial. The court also focused on PRMI litigation tactics that contributed to the seeming disproportionality. The court described at length how, despite warnings by ResCap counsel of the contractual fee-shift provision, PRMI vigorously contested -- before and during trial -- issues that obviously had little impact on its damage exposure, and relitigated issues previously decided in the Common SJ Order and later in this separate case. In comparing the fees awarded with the results ResCap obtained, the district court did not fault PRMI for its aggressive defense. But it did quote Seventh Circuit Judge Frank Easterbrook, appropriately in

-22-

our view: "defendants who drive up the expense of litigation must pay the full costs, even if legal fees seem excessive in retrospect." Cuff v. Trans States Holdings, Inc., 768 F.3d 605, 611 (7th Cir. 2014).

After careful review of the district court's thorough analysis, we conclude the court did not abuse its discretion in awarding attorney's fees that rather substantially exceeded the damages award. The district court thoroughly explained why it concluded a disproportionate award was reasonable in this case. The Minnesota Supreme Court has cautioned that the requirement "to consider the amount involved and the results obtained when awarding reasonable attorney fees does not amount to a 'dollar value proportionality rule.'" Green v. BMW of North America, LLC, 826 N.W.2d 530, 538 (Minn. 2013). Although Minnesota appellate courts, like this court, consider results obtained a "critical" factor, Milner, 748 N.W.2d at 622, they will uphold as reasonable contractual fee awards in excess of contractual damages recovered. See Northfield Care, 707 N.W.2d at 736.

**C. Prejudgment Interest.** PRMI's final argument concerns the district court's award of prejudgment interest on the original $5.4 million damages award. First, in the Order on Attorney's Fees, Costs, and Prejudgment Interest, it awarded $2 million in interest for the time period between the commencement of the action against PRMI until the entry of judgment on August 17, 2020. That award is not at issue on appeal. Second, the court then awarded an additional $520,212 in interest for the time period between the initial judgment in favor of ResCap and the final judgment. For this period, the court relied on the Minnesota prejudgment interest statute, which allows an interest rate of 10% "from the time of the verdict, award, or report until judgment is finally entered." Minn. Stat. § 549.09, subdiv. 1(a), (c)(1)(ii)(2). Applying the general rule that "prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court," the court reasoned that judgment was not "finally entered" until after the fee award, because the initial final judgment reserved the question of attorney's fees, costs, and prejudgment interest. On appeal,

PRMI argues the court erred in refusing to apply the lower interest rate prescribed for postjudgment interest under federal law. See 28 U.S.C. § 1961. We agree.

We have often said that "federal law governs the award of postjudgment interest . . . while state law governs the award of prejudgment interest." Weitz Co., Inc. v. Mo-Kan Carpet, Inc., 723 F.2d 1382, 1385 (8th Cir. 1983). Though Weitz was a diversity case, we declined to resolve the "uncertain" question whether interest is an issue of substance or procedure under Erie R.R. v. Tompkins, 304 U.S. 64 (1938). Rather, we held that the recently amended federal postjudgment interest statute was controlling because it addressed "a subject with respect to which Congress has full power to legislate, even as to cases that get into the federal courts only because of diversity of citizenship." Id. at 1386; see Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 27 (1988) ("If Congress intended to reach the issue before the District Court, and if it enacted its intention into law in a manner that abides with the Constitution, that is the end of the matter.").

The district court entered its Judgment in a Civil Case awarding ResCap $5.4 million in damages on August 17, 2020. The federal statute provides interest calculated at a prescribed floating rate "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The district court held that, as a matter of Minnesota law governed by Section 549.09, a final judgment was not "finally entered" until its Judgment in a Civil Case resolving attorney's fees, costs, and interest was entered April 28, 2021, and therefore Minnesota's ten percent prejudgment rate applied in the interim period. But Section 1961(a) does not say "final judgment," it says "money judgment." The district court on August 17, 2020 entered a "money judgment." Thus, as in Weitz, the plain language of the federal statute applies to the interim period and is controlling. Accord Youngs v. Am. Nutrition, Inc., 537 F.3d 1135, 1146 (10th Cir. 2008). The district court erred in applying Minnesota law to calculate interest after August 17, 2020, rather than 28 U.S.C. § 1961(a).

## VI. Conclusion

For the foregoing reasons, the judgment of the district court is vacated and remanded on the issue of postjudgment interest. In all other respects, the judgment is affirmed.

_____